p.m. Second Division is valid... I will express my for the problem of silence. Mayor, Ma'am and Clerk, please call the case. Council please approach. Please state your name and correct me how much time you would like. Gavin Dow for Defendant Appellate for Alasdair and I would be asking him for 15 minutes. Assistant State's Attorney Christopher Miller on behalf of the people of the State of Illinois would be respectfully requesting 15 minutes. Okay, thank you, you may proceed. Good morning, Your Honors, may it please the Court. The confession that was played in Mr. Soto's trial should have been suppressed for one of three different reasons. First, it was the product of an earlier confession that was only obtained by deliberately withholding the Miranda warnings. Second, at the time that he confessed, Mr. Soto did not understand the nature of his rights and therefore could not knowingly waive them. And third, his confession was induced by using information that detectives obtained while he was illegally under arrest at Area 4. For any one of those three reasons, the trial court should have suppressed Mr. Soto's confession and we are asking this Court to reverse. Unless the Court would like me to start with a different issue, I plan to start today by discussing the deliberate withholding of the Miranda warnings. Under Cybert's, the rule is clear. When police officers deliberately withhold the Miranda warnings in order to undermine their effectiveness, curative measures must be taken before any subsequent Miranda-esque confession respecting the same subject matter will be admissible. At what point during this protracted period of time that he was at Area 4 should the police officers have given him his warnings? What was the evidence? I understand. The trial court found that when the police officers brought Mr. Soto back to Area 4 after meeting with Herculano Morales and learning that Mr. Soto had been to his home and said that he had beaten somebody, that the police at that time knew that he wasn't going to be free to leave and knew that he was their suspect. So where was that in the continuum? It was about 48 hours a day. I think the question was where was that in relation to when he did get Mirandized? Well, where was it in relation to when he first met the police officers on the street and then went through these stories, stayed overnight? How much time did it last before police, in your judgment, should have given him the warnings? So insofar as whether or not they were deliberately withholding the warnings? Well, when do you think that they should have first given him the warnings in a time continuum? So the reason that I'm struggling a little bit with the question is this. I think the evidence shows that he was under arrest about 24 hours in. But the trial court made a finding that the police didn't necessarily know that. So the facts that we're dealing with are the trial court's finding that at about 45 hours in, so this would be at the very end of the stay, right before he confessed, is when the police actually knew that he was their guy. So what happened 24 hours in, in your view, that he should have been Mirandized? So in my view, he was in custody in the sense that if he was under arrest, a reasonable person would not have felt free to leave 24 hours in. And the reason, two reasons. First, that was the first time that he had been confronted about inconsistencies and things that he had told the police. With regard to the location being wrong? I'm sorry? With regard to the location of the houses being the wrong houses? Correct, Your Honor. But the second reason is that there's no evidence beginning with that point that he was told he was free to leave. So before then, there is officer testimony that there was telling him that you're free to leave. So they had to keep telling him periodically, you know you're free to leave. Well, I think so, Your Honor, especially in this case. He's being kept confined in a small windowless room. Well, why do you say he's confined? The door was always open. He was not restrained. He was not allowed to leave without a police escort, though. Well, but that was because of the location of other detectives' desks. I mean, that was the evidence that no member of the public would have been allowed to walk around the station unaccompanied. That's correct, Your Honor. But the fact remains that he still wasn't able to do that. And that in and of itself wouldn't be enough. I mean, my mom went to a police station because her car was stolen, and she had the same thing happen to her. She was there for an hour. Mr. Soto was there for 48, and then more after. But didn't the court find that he was there voluntarily, that nobody believed he was in custody? There was no evidence to cause the judge to believe he was in custody? Well, the judge was skeptical about whether or not Mr. Soto would have actually voluntarily stayed, but he found that the evidence was unrebutted on that point. So he found that he wasn't in custody. It's a factual finding that we have to give deference to, right? No, Your Honor. That's actually a legal conclusion that this court can review de novo. And the standard which you use to review it is how would a reasonable person in that situation have felt Would they have felt that they were free to go? Or would they have felt that they weren't free to go? Was he told by the detectives as to the reason why he couldn't just leave on his own from that room? Is there any evidence that they told him, the reason you can't leave is because we have a rule that members of the public cannot leave this room without an escort? I don't believe so, Your Honor. So he had no idea why he needed an escort? I don't think there's any evidence that they told him that. See, the difficulty is that we're dealing with a person who admittedly had emotional or intellectual problems. I mean, I don't think there's any question of that. And the testimony accepted by the judge was that he was homeless and he basically wanted to stay in a confined area that he knew was confined. But the police never said that he can't leave. He cannot leave. They only said don't be walking. Essentially, don't be walking around, which would be a different level of conversation than he would have with your mother, who went there to report, you know, precaution. It's just a whole different set of circumstances. So in the context of the circumstances, what is it that would lead a judge to conclude that he was, in fact, in custody and not free to go? Because there's nothing in the record that I see that indicates that they were zeroing in on this defendant. So the first judge, there's no question that the police were investigating Mr. Soder during this time. During the first 24 hours or so, when they were checking up on his story, they didn't necessarily tell him that they were doing that. But about 24 hours in, in the evening of the 5th of October, they started taking him around in the back of a police car to look for people. They confronted him when he couldn't find those people. They took him out again to look for them. They found someone who told a different story than what Mr. Soder had told the police. They put the two of them in a room together and confronted them with each other. And I think those are the circumstances, Your Honor, that really separate those first 24 hours when Mr. Soder was also being told he's free to go. From the remainder of the time that he's at Area 4, when he's no longer being told he's free to go. And in fact, Detective Garcia testified that on the night of the 5th, he asked Mr. Soder to stay in the area and to cooperate. So the effect that that would have on a reasonable person would be to communicate, you're not free to go at this point. So prior to 24 hours, if we're going to say we're going to second-guess the trial judge on the evidence that was presented, prior to 24 hours, Soder had told the police about El Moro and Morales, right? So what basis is there? I know your motion says suppress not only his statements, but any other evidence that the police got. What basis is there for suppressing that? Well, at that point, they hadn't found those people. You don't think they could have? Well, there's no evidence, at least, that they had anyway that they could have. The evidence shows that on the 6th, Soder led them to both of those individuals. So that would be the reason why it would be connected to the illegal arrest. His idea wasn't that he stay. Was that his idea? It's hard to say. Was it something suggested? I believe the testimony was that, at least on the first night, that the detective who questioned him that night said that he was free to stay, and that Mr. Soder said, oh, yeah, I'm happy to stay, help. He said, I don't have any place else to go. Right. But they invited him to stay. You're saying that the testimony is your recall of that? I don't believe they said, hey, we want you to stay at the police station. But they also didn't say, okay, it's time for you to leave now. So what the specifics of that interaction were, it's hard to say. But, once again, that's one hour into this. This is before he finds out they're investigating him. This is before they stop telling him that he's free to go. This is before they start confronting him. This is before they find out that what he said initially wasn't true. And those circumstances are very different from the circumstances of someone who's just come to the police station. It's also, you have an individual who's homeless. He says he's not going back to the place where the dead body is. He's an alcoholic. If he leaves, they may not be able to find him. There's no address for him. So I think that raises a couple points. First, this was not a comfortable stay. He was put in this small room, and he stayed there for the vast majority of those 48 hours. Well, where were they supposed to, you know, it's almost like the police can't win. It's not like they forced him to stay, according to their testimony, or any other testimony. And it's not like he tried to leave. So, you know, maybe they were just being nice to a guy who, you know, is homeless and an alcoholic and is troubled and disabled in some mental way. And, you know, his friend had been found dead. You know, making it in the best light. So he's there. So they either throw him out on the street, probably can get him in an hour if they went looking for him, because typically you go back to where you're comfortable. But they let him stay. Now, I don't see what's unreasonable about that. It's not the fact that they let him stay in the police station, Your Honor. It's how they actually did it. They didn't put him in a public area of the station where he could move around or even go to the bathroom without having to ask permission. Is there anywhere in the public area of a police station that he could have lain down and gone to sleep, which he did for many, many hours on the videotape? We don't have in the record evidence specifically about what the waiting area is. I'm not aware of any waiting area in a police station that has somewhere where the police would even allow you to lay down. Well, there's seats somewhere, right? And somebody can sleep sitting in a chair. I mean, you can be in a public area.  There's no place to lay down to sleep in the waiting rooms. Which would you prefer, Mr. Dow? Would you like to sleep in a chair or lie down on a bench? I would prefer to go home. I think obviously you could sit in a chair, and some people sleep just fine in chairs. But look at where they put him. This wasn't just a bed. It wasn't a cot. It was a metal bench. They didn't give him a pillow. They didn't give him a blanket. I mean, if this was a charity case, I think that you'd probably see some indications of that. But what you're actually seeing is that the officers are treating him as someone that they don't want to leave the station. They don't want him to be comfortable. And why wouldn't they just put him in a holding cell? I mean, they don't want him to leave. You say he's not free to leave. They're confronting him. Why not just put him in a holding cell? Why not give him new civilian clothes for the dirty, smelly clothes he came in with? Why not just give him a jumpsuit? You know, there's all sorts of things that if the police suspected him, they could have done. And they didn't. If they do any of those things, though, Your Honor, they're going to have to justify why they did it. Because those are obvious indicia of arrests. And they don't have probable cause until 48 hours in. So if they put him in a holding cell and locked the door on him there, there's no question what happened. He wouldn't have been free to leave. He wouldn't be here, and his confession would have been suppressed. So they put him somewhere else that's confined. So it was all part of this preconceived plan on the part of the police. And we're going to bring you new clothes. We're going to bring you a new top, a new pants, new shoes to wear. Because the clothes you came in here with smell so much. Well, it's also for their own good, too, because they're in the same room. This is a small, confined space, and they have to breathe the air. But it's all part of their technique to just get him to stay here and talk. When they knew he was the guy long before he said anything. I don't think that they knew he was the guy right away. The trial court said that it really had a hard time believing that they didn't think that he was a suspect when he came in. But I don't want to focus too much. I don't remember that. I don't remember the trial court saying they figured he was a suspect when he volunteered to come in. I don't recall that. I believe the trial court didn't say this, as a matter of fact, is what happened. The trial court expressed skepticism. And then the trial court heard the testimony. I mean, what the trial judge said, as I recall, was, yeah, looking at 48 hours in an interview room, and the assertion is the defendant stayed there voluntarily, gosh, that's pretty unusual. And then the judge heard the evidence and made credibility determinations. The judge made those remarks after hearing the evidence, Your Honor. But you're correct. The judge said that the police officer testimony was unrebutted. But the custody determination isn't a factual question. And that's why I want to talk about not necessarily the police officers, but how what they are doing would have been perceived by a reasonable person in that situation. So I go back again. Mr. Soto is in this room or in the backseat of a police car for 48 hours. Now, the first 24, you have this testimony that they're telling him for you to leave, et cetera. But that second set of 24 hours, that stops, and it becomes clear that they're investigating what Mr. Soto is telling them. So objectively, and it's an objective test, someone who is sitting in that situation is not going to feel free to leave. And that's why Mr. Soto was in custody at that point. Typically, in a motion to suppress, there's testimony that I felt I tried to leave. I didn't feel I was able to leave. I didn't think I could leave. I tried to leave, and they told me I had to stay, you know, something. Now, we don't have any of that. Now, granted, this is not your typical reasonable person, right? But there may have been no indication whatsoever that he wanted to leave. You know, and that's the dilemma that you're in. I understand, Your Honor. But he does not need to testify. No, he doesn't need to testify, but there's no testimony that indicates that there was any circumstance that led to a question about whether he was free to leave other than the statements that he wasn't in custody. Respectfully, Your Honor, I disagree. And the reason is that the testimony established that they kept this guy in this room for 48 hours. They kept him or allowed him to stay there? Pardon? Kept him or allowed him to stay there? Either or, he's there. He can't leave that room without permission. And on top of that, on top of the time, on top of the restriction on his movement, whether or not it's reasonable, they are questioning him. And they're honing in on him, and he knows it. That's being communicated to that person. How's it being communicated? Because they keep coming back to him when they find things that are inconsistent with what he's telling them. Because they are investigating, among other things, what he did after the death. So they're looking not only at things he might have known before that could help them find who did it, but they're calling into question, what did you do afterwards? What other reason was there to ask him about Guerrero Morales? Or to go find him? That was after Mr. Soto said that he discovered his roommate dead. And the reason is that they're investigating him. And that's going to be communicated when you're asking those kinds of questions. Very early on here, I forget which one of you it was, but one of the members of the court was asking a question about when should the police have given Mr. Soto the Miranda warnings. And during that 38-hour period in front, maybe the police officer might look at things a little bit differently. But at the time they come back, and this is what the trial court found, Your Honors, is that they knew they weren't going to let him go. They knew he was a suspect. They knew they had probable cause. You're talking about after they went to talk to Morales. That's correct, Your Honor. And they put him in one of the interrogation rooms, and they said, you've been lying to us about everything. That's a custodial interrogation. And the trial court found it was deliberate that they did not give Mr. Soto the Miranda warnings. All right, and so that gets the first two statements out, which the trial court suppressed. But then we went to the third statement. The reason that the third statement comes out, Your Honor, is that not only was the Miranda violation not cured, but it was made worse by the second confession. So by the time Mr. Soto confesses for the third time, he's already done it twice. And he's told that anything you say can be used against you. Not anything you tell us right here can be used against you, but anything. And that includes those two confessions, which were not admissible. Now, who determines that? Does a police officer determine that and then say to a suspect, you know, what you just told me is not admissible? What if the police officer's wrong, legally? Well, once again, you've got to go back, Your Honor, to the fact that the trial court found this was deliberate, that this wasn't an accidental, you know, arrangement. Because if it were that, the Miranda warnings alone would be sufficient on their LSAT. So when you are deliberately undermining the constitutional rights of someone that you're interrogating by withholding the Miranda warnings, it is on you to fix that. And one of the ways to do it is to tell them what you've told us previously isn't admissible. There are other ways to do it. Substantial break in time, right? Combined with other changes in circumstance. Different personnel. Right. But in this case, what happens between these two confessions? Mr. Soto sits in the same room. So if they locked him into a third interrogation room, that would have been? I don't think so in this particular case. I think that you'd have to look at a bunch of different things. Essentially, what could have happened? Tell me what could have happened in between the second and third confessions that would have attenuated the deliberate ask first, warn later? So what would have cured that? Obviously, if they had explained to him that what he said previously couldn't be used, so he knew he actually had a meaningful choice to make. If he had a lawyer, the lawyer would be able to help him? Well, if you've Mirandized the defendant once and he hasn't asked for a lawyer, is it the police officer's responsibility to say, I know you haven't asked for one, but let me get you one? Well, the police officer at this point has deliberately undermined the effect of those warnings. I understand that, but he has been Mirandized. He's been told, you have a right to a lawyer and one free of charge if you can't afford one. He hasn't invoked his right to a lawyer. So what's the police officer supposed to do? Well, the police officer is supposed to Mirandize people that they're interrogating. The reason the police officer is in such a difficult position at this point is because he's deliberately withheld the warnings from someone who's in custody. The simple way to avoid this is just to give them Miranda warnings in the first place. But once you've deliberately not done that, you have to cure it. Now, I was just suggesting a lawyer is one way that might do it. It's very hard for me to come up with facts that, in this case, would work other than something major because he doesn't move, because the same people are present, Detective Garcia. If you have a combination of all of these things. Detective Garcia, one of the facts that courts look at in the change of personnel is whether there's a different questioner, and there was here. And Detective Garcia only communicated with the assistant state's attorney who was examining Soto. One of the first things they told Soto during that third confession is, Detective Garcia is here because you talked to him previously. And he corrected what Mr. Soto said when he got it wrong during that questioning. Just his presence there continued. Yes. And in that, the situation, by doing that, just in and of itself, there's no cure. No matter how many hours may have passed, it seems to me, how can you cure when you have the individual who's been around Mr. Soto for all these hours there watching him and providing information to this assistant state's attorney? I think it's very hard to do that with Detective Garcia present. I agree, Your Honor. And the other thing I'd point the court to would be Lopez. And this is what the Illinois Supreme Court talked about in Lopez. They said, we have the same detective here. Yes, he's giving a handwritten statement to assistant state's attorney, but we have the same detective who took the earlier un-Mirandized statement. And that's one of the reasons in Lopez why it was not cured. There's one other issue in this case I'd just like to touch on briefly, and that is the trial court found that Mr. Soto was able to understand the Miranda warnings and was able to validly waive his rights. But there was really just lots and lots of evidence that Mr. Soto was not intellectually very capable, that he was somebody who, if you told him something, he would say that he understood it even when he didn't, and that he was an alcoholic. I mean, just to mesh the issues together, in your view, it wouldn't have made a difference if they warned him prior to the first statement, because he just couldn't waive those rights. Couldn't understand them, couldn't waive them. I think that that's correct, Your Honor. But there are multiple reasons why each one of these should have been suppressed. And so if you can't understand the Miranda warnings, obviously you can't waive those rights. If you couldn't understand them the first time they were given, which was at the second confession, you couldn't waive them. And that's just because if you're going to give a confession, if you're going to implicate yourself, you have to know what you're doing. You have to understand that you have a right not to do that. But we're supposed to look at the circumstances. I mean, there's been several cases I've said just a low IQ and alcoholism or drug addiction is not enough. The courts have looked at circumstances surrounding the situation as well as any physical ailments. And we have more than that. We have specifics about how Mr. Soto interacts with people when he's giving new information. Dr. Gonzales testifies that basically he has a very difficult time learning new information. He can do it. But not when you just say, okay, here's the new information. You understand, which is what happened here. And the state had experts that said otherwise. Well, the two state experts, one was a neuropsychologist, and he testified that he did not believe it was necessary to run a test that Dr. Gonzales had already done. And the other, Dr. Echevarria, he based his opinion partially on his interview two years later, but also partially just on watching the video. And the problem is that if you're going to go along with something that you don't understand, that's not necessarily going to be apparent until you're asked something like a test direction that you don't do right. So just saying yes on the video isn't going to communicate that. On top of that, look at how the state handled consent. The state experts handled consent. They didn't do what the police officers did here. The state experts discussed the matter. They made sure he understood. They had him articulate it. And then they moved forward with their examination. Investigators just said, hey, here's your right. Do you understand? Yes, and moved on. And I think that's telling, Connor. I think it's telling about what they thought was necessary to make sure that Mr. Soto understood what he was doing. Well, is there a case that says police officers, other than reading the rights as they're described, have an obligation to explore in some depth with a suspect their understanding and their ability to waive those rights? Do more than tell them what their rights are and ask them if they want to cooperate. There's no affirmative obligation. But there is an obligation to not present evidence of a confession that was taken when that defendant did not understand what his rights were. I mean, that's not the fault of the police. So, I mean, the trial judge made a determination based on expert testimony and the review of the video that actually the determination was, it wasn't like the custody determination. He said, I have no doubt that he understood and validly waived those rights. The trial court had no doubt that he understood before ever hearing any evidence. Well, he said that. And then he later on said, irrespective of what I might have said earlier, that's correct, Your Honor. But he did say it first. And when we get to the findings, it turns out that a large part of why he thinks Mr. Soto understood and ran the warnings after being in Area 4 for 72 hours, after not having a drink for 72 hours, was because of what he saw, just sort of basic interactions in court in a period from two to four years later. Well, for Mr. Soto, obviously, it's not drinking. Well, one would hope not. And, no, he's in a different place. And it was also how he interacted in the courtroom, Mr. Soto, with people. The trial court cited his own interactions with Mr. Soto. On the record, almost all of those are just exchange of pleasantries. There are a couple of times where there's a brief question and answer about various issues, nothing complicated. And the trial court also said that he observed Mr. Soto talking with his lawyer. But none of that really says anything about whether he would be able to understand, under vastly different circumstances, at the police station. Any other questions? Thank you, Your Honors. Mr. Miller, we will not keep you 15 minutes. Excuse me, I'm 15 minutes down. Thank you, Your Honor. May it please the Court, my name is Christopher Miller, Assistant State's Attorney, representing the people of the state of Illinois. Defendant's primary argument is that after 24 hours interacting with the police, he was, at that point, arrested and in custody. However, the record does not support that contention. This individual, the defendant, is the individual that was voluntarily with police officers beginning on the night of October 4th. Defendant arranged to have the police called to the scene of the crime, directed the officers to the victim's body, went back to the police station with officers on October 4th, at which point he was told, you are free to leave. And his response is, I want to know what happened to my friend. It's warm here. I got nowhere else to go. The following morning, defendant, again on October 5th, is told, you're free to leave. And the defendant reiterates, I have nowhere to go. I want to stay here as long as necessary to investigate, to help to see what happened to my friend. What about Mr. Dow's point that after those two exchanges, the police never again admonished Mr. Soto that, by the way, you're free to leave? Your Honor, that's not correct. The defendant was told as late of the night of October 5th, roughly 5, 10 p.m., that he was free to leave. And, again, the issue of seizure is from defendant's perspective. This is an individual that had at that point been told now multiple times he wanted to leave and was given food. He had a warm place to stay. And as he told the officers, I have nowhere else to go. Additionally, defendant did later tell the officers in one of the interrogations, as well as Dr. Viale-Vall in their interview for his examination, another reason he chose to stay was to see what the police had. So not only did he have nowhere to go, but that communicates an additional reasoning for defendant to stay. While it may not have been a smart decision for him to do so, that provides evidence that defendant was voluntarily at the police station both because he was receiving shelter and because he was hoping to get perspective on where the investigation was going. How many, the last time he was told he was free to leave at 5, 10 on October 5th? That was the last time he was explicitly told he was free to leave. Okay. And how many times in total do you say he was told? At least three times explicitly he was told. That being the last? That being the last. Two other times. Correct. However, on the night of October 5th at 8, 9 p.m., officers returned from looking for individuals by the name of El Moro. And at that point in time, defendant said we weren't able to find these individuals. And defendant suggests, why don't we go back out and look again. I want to correct any miscommunication there may have been. I would argue that that shows also that he's still there voluntarily. At his own suggestion, he is offering to go back into the neighborhood and assist the officers. And the detectives testified at that conversation. They arranged to go back out in the neighborhood the next morning of October 6th. It was already late at night. And so at that point, defendant is still there voluntarily. And the treatment that he's receiving from the police officers has remained consistent. From his perspective, he's not being treated any differently at that point to signal to him that I am not free to go. And that is the lens that seizure is viewed through, the lens of a reasonable person in this case in the defendant's circumstance. So when they bring El Moro in to say, you know, he's telling us a different story about what you were doing during the day, and have them in the same room together, is that a signal that maybe he's not free to go? No, Your Honor. At this point, the detectives have had a free dialogue with defendant in trying to pin down what happened. And the detectives have testified that defendant was the only source of information that they had. And at that point, there were some discrepancies about the timeline. And after communicating that with El Moro, they took defendant, defendant offered to go back and went back out into the neighborhood. And it's very telling in this case. Defendant never asked to leave. Defendant never asked, when can I leave? Defendant never asked if I'm going to leave. If defendant did not want to be at the police station, he would not have been. He would have left. And the fact that he's never asked the officers at any point during his stay demonstrates that defendant was there voluntarily. And as a result of being there voluntarily, there is no Fourth Amendment implication in the lower court properly denied defendant's motion to quash arrest and suppress evidence. What was explained to me the misunderstanding? There was an initial ruling suppressing all three statements. The state filed a motion for reconsideration. The court reconsidered and said, okay, first two but not the third. What was the misunderstanding? The court said I was under a misimpression about what the issue was. Correct, Your Honor. Initially, the court suppressed all three statements. Upon the motion to reconsider, the court stated the court was clearly incorrect on finding a fact in law regarding the motion to quash arrest and suppress evidence. Then based on the motion to reconsider, the court found that there was probable cause after the conversation with Herculano, and therefore those three statements would not be suppressed under Fourth Amendment grounds. And then the court proceeded to the Fifth Amendment analysis. But for Fourth Amendment purposes, the court correctly found that probable cause existed, and prior to that determination of probable cause, defendant was voluntarily at the police station, neither of which would implicate the Fourth Amendment. As to defendant's Fifth Amendment contentions in suppressing the third statement under Siebert, that would require a deliberate police flagrancy, deliberate misconduct from the beginning to entice this individual to confess without Miranda warnings. The court did find that after they had visited defendant's cousin, they came in and sat him down and said, you know, what gives? And he immediately said, okay, I did it. That they did that deliberately because by the time they talked to defendant's cousin, they knew they had probable cause to arrest him. Yes, Your Honor, the court found that there was probable cause at that point in time. However, from the perspective of the officers, they testified they did not believe they had probable cause. And probable cause is a determination by a man. No, the court found that not credible. I mean, in some respects, the court found the police officers credible and others not credible. And that was one of them where the judge said, I just don't believe they didn't actually feel that they had probable cause to arrest him. Correct. Yes, however, in this instance, there's no secret violation if you look at the totality of the circumstances of the officers. When they returned to the police station on October 6th at approximately 930, when they're speaking to defendant, they confront defendant with, we spoke to your cousin, we know you haven't been completely truthful, not about your name. At that point, defendant nods his head in agreement and says, I did it, I killed him, I hit him. And that's when they cease the interview. Siebert is intending to prevent officers from walking through defendant's entire confession. At the point they ended the first interview with defendant, he had not even stated, I killed Julio or I killed my roommate. He didn't even provide a name before they ended the interview. They knew who the name was, so that's ridiculous. Okay, so let's go to why did it take 24 hours to get an ASA over there? It seems to me that there is a problem. Those first two confessions, they knew they had a problem. These are intelligent officers who've been with this guy for 72 hours. And it takes 24 hours to get the ASA over there. And then they bring one of the detectives in the room. He's in the room. He's in a similar room to the rooms that he's been in. And what do they do? Under Lopez, there has to be some cure. What is the cure? To answer your first question, Your Honor, an ASA initially did arrive at the police station prior to 24 hours. However, that ASA was not a Spanish-speaking individual, and there was no Spanish-speaking ASA available at that time. But they had an interpreter. When he was interviewed, 24 hours later, there was an interpreter, a detective interpreter. It wasn't the ASA that was Spanish-speaking. Correct. However, the initial encounter for the ASA to review all of the evidence included reviewing the DVD recordings of the first interview, which was conducted in Spanish, so not having a Spanish-speaking ASA present to review that. You're saying the second ASA was Spanish-speaking? Correct. The second ASA that arrived was a Spanish-speaking ASA that was able to review the recorded interviews, which were conducted in Spanish. And as to the third interview with the defendant on the night of October 7th with the ASA, the ASA leads that interview. It's in the record that she speaks Spanish? Yes, Your Honor. She was a Spanish-speaking ASA, and she leads that interview. Detective Garcia is present, and the video shows that he is sitting off to the side in a chair. It's a small room, so where he's sitting isn't really critical. What's critical is what they did to cure. So I'm trying to figure out what they did to cure, because you've got to make it clear to the reasonable person that you've cured. That's what Lopez said. Correct, Your Honor. Foremost, our position is that there's no violation based on the totality of the conduct by the officers. There's no police flagrancy. Assuming the defendant is a unique cure. Correct. Okay. In that situation, what was the cure? Assuming the violation, the cure is the length in time between the initial confession, where he was not Mirandized, roughly 24 hours later. At the time that he, on October 7th, the confession that was admissible, he had been Mirandized twice at that point, and there's a different person leading the interview. Not a different detective. It's an assistant state's attorney who explained their role in the case. But you still have Detective Garcia in the room, sitting there. He knows that he confessed twice. Nobody's told him anything about what the problems might be with that. We've got to look at it from the point of view of the defendant, the reasonable defendant, not from the point of view of the police officer. Correct. And what the court is engaged to determine is whether the defendant was able to distinguish the two contacts and appreciate that the interrogation had taken a new turn. And how would he have done that? Based upon Miranda warnings being given to him. But he already had Miranda warnings twice. Well, but he already had Miranda warnings. Correct. Based upon the Miranda warnings, he was told he doesn't have to speak. He can have an attorney present. It had been 24 hours previously since his first confession. And the new person conducting the interview explains what her role is in the investigation and her purpose. At that point, while Detective Garcia is present, he's not leading the interview and he's not engaged in discussing with the defendant. And from the defendant's perspective, the video of his confession on October 7th is clear. His body language and his focus is directed at the assistant state's attorney and the individual translating from English to Spanish. While Detective Garcia is present, Your Honor. And he speaks to the ASA. However, the time he speaks to the ASA is after the defendant has walked through every aspect of the confession. And it's not until the very end of his confession that the defendant, excuse me, the detective speaks to the ASA. And you don't think his presence there would give a hint that this is no different than what happened before? Except that now we have an ASA in the room. So business as usual, I don't see where the cure is. The fact that some time passed, apparently the reason it passed was because of the need of a Spanish-speaking ASA. But that in itself is not enough. There's no case that this passing of time in itself is enough. Correct. And, however, it's not just the passing of time. It's the Miranda warnings and it's the ASA's help. But there was nothing cured. The Miranda warnings were the same warnings he's already received. So, you know, I don't understand the fact that he got the Miranda warnings again. How is that curing him? It's reinforcing to the defendant that he doesn't have to speak. He's aware of the circumstances. And given the Miranda warnings, that would signal to the defendant that the interrogation has taken a new turn and it's now in a different context. Taken a new turn. Okay, that's the phrase you're using. How is that showing it's taken a new turn? What happens if he gets the Miranda warnings again? Prior to his involvement in his interactions with the officers leading up to that point, there had been a free flow of discussion. He had not been given his Miranda warnings. The giving of Miranda warnings is a signal to the defendant as they expressly tell him what you say can be used against you. At that point, that would signal to the defendant that this conversation can be used against me and is different than the conversations I have had with the police officers previously. How is it different? Because previously he had gotten a Miranda warning. Don't the Miranda warnings tell him that notwithstanding the fact that you've already spoken to somebody else, you don't have to speak to me? Correct. They informed the defendant that he did not have to continually participate in these interviews. But we're dealing with somebody who is very low IQ, who's an alcoholic, who's been at the police station for 72 hours, and an individual with whom he's had a long relationship for the last 72 hours is in the room watching him, knowing that last time he said something that didn't turn out to be truthful, he got caught. Everything you've stated is correct. However, the issuing of Miranda warnings at the time in the ASA conducting the interview is signaling to the defendant that the context in which he is speaking, which he's choosing to speak to the officers, has changed. And that, again, is the assumption that the violation has occurred. And it's our position that it's a secret violation. Are you supposed to know that? No, no. I'm clarifying our argument in the sense that it's our position that it's a secret violation. Assuming that there was a secret violation. Correct. And that assumption that it would be cured. However, it's our position that no violation occurred because his conduct wasn't flagrant. They didn't walk him through the interview. They ceased it immediately. And this was an individual that had voluntarily been with the officers now for roughly 48 hours. And so the police's conduct is not the flagrancy that Siebert and Lopez was intended to prevent where they have someone in custody and are going to walk them through their entire confession and then at the end say, by the way, here's your warnings, why don't we just go through that once again. This is an interview that was ceased immediately. As soon as the defendant said, I did it, I killed him, they stopped it. And they followed Miranda and turned on the ERI equipment. For those reasons, we would argue that no secret violation occurred. And if it did, for the reasons stated, it had been attenuated. And defendant's confession was found to be intelligently and knowingly waived for his Miranda warnings, which there's ample expert testimony in the record to support that defendant was intellectually capable and knowingly waived his Miranda warnings. The testimony of Dr. Echevarria and Jasinski state that at the time of the interviews, defendant was capable of waiving those Miranda warnings. And while defendant argues that the opinions of Dr. Viale-Vall and Dr. Gonzalez, who testified he was not capable of determining whether defendant could waive his Miranda warnings, that testimony supports, the state's expert testimony supports the court's finding that he was able to knowingly and intelligently waive. And the standard of review is whether the court's finding was against the manifest weight of the evidence. In this instance, the state's expert witnesses, Dr. Echevarria and Jasinski, testified clearly and coherently and credibly that defendant was able to knowingly and intelligently waive. And the court's finding on that is not against the manifest weight of the evidence. And for these reasons and the reasons stated in our brief, we respectfully request that this court affirm the lower court's denial of defendant's motion to quash arrest and suppress evidence as well as the in part denial of defendant's motion to suppress the statement. Thank you. Thank you. Just a couple of brief points, please, Your Honors. First, in Lopez, it was the same situation. It was a supposedly spontaneous statement. The officers ended questioning immediately and then gave him the Miranda warnings and re-interviewed that person two hours later. How soon after the spontaneous? I'm sorry, how soon was the second? How soon after? The second one was about two hours after that. Okay. And also, when it comes to curing deliberate Miranda violation, the issue isn't whether or not the defendant understands the Miranda warnings, because that's just what LSTAT says. CIDR is an additional rule. CIDR says you also have to understand that you retain meaningful choices here. So it's not just does this person understand that they can be quiet if they want. It says this person is getting communicated to them that deciding to stay quiet might actually matter. And on the Fourth Amendment issue, the State mentioned some things that Mr. Soto said in some of those interviews with doctors about how he was there to see what happened to his friend. There's also evidence that Mr. Soto said that he was under arrest for 72 hours before he made those statements. And in fact, in his second confession, the ASA says, you've been in their custody now for 72 hours, and Mr. Soto affirms that. There's something that's very remarkable about this case, which is the treatment of Mr. Soto for 72 hours, both before he confesses and after he confesses, is extraordinarily similar. The one change is that once he confesses, they lock the door. Before that, the door was open, but he couldn't leave. That's a very minor thing compared to everything else, and I think it's very telling about what a reasonable person would have perceived in those situations. Well, after... When he locked the door, he can't leave. And after he was arrested, they never again took him out in the police car, even though they were still going out trying to gather more evidence. Now you're under arrest. We don't take arrestees out in police cars. They also had no need to take him anywhere. And he left the police station in that 48-hour period, I think twice. Three times, I'm sorry. Three times. The rest of the time, he's sitting in that room before he confesses and after he confesses. It's the same room. It's virtually the same situation. We ask the Court to reverse Mr. Soto's convictions on the Fourth Amendment issue outright and on the two Miranda issues for a new trial. Thank you. Thank you. Thank both sides. Your arguments were excellent. You did a very good job and both well prepared. Your briefs were also very well done and gives us a lot to consider. We'll take the case under advisement. We stand adjourned. Thank you.